Mattie West **RADFORD**, Widow of Fred Radford, and R. C. Radford, Administrator of the Estate of Fred Radford, Deceased, Plaintiffs,

v.

Park C. **WEST**, Defendant.

Civ. A. No. 1473.

United States District Court
W. D. North Carolina, Asheville Division.
Aug. 30, 1955.

C. E. Hyde, Murphy, N. C., Williams & Williams, Asheville, N. C., for plaintiffs.

William J. Cocke, Asheville, N. C., for defendant.

WARLICK, District Judge.

This is an action in which plaintiffs seek to recover money damage on account of the alleged negligence of the defendant. It was begun in the Superior Court of Cherokee County, North Carolina, and was removed to this court for diversity and amount, § 1441, 28 U.S.C.A. It was submitted to the court without a jury.

Plaintiff, Mattie West Radford, is the widow, and R. C. Radford, a son, has been duly appointed as the personal representative of the deceased, Fred Radford. They both live in North Carolina. The appointment was made by the Clerk of the Superior Court of Cherokee County. The defendant is a resident of the State of Tennessee.

On October 29, 1951, the Commonwealth Lumber Company of Murphy, North Carolina entered into a contract with the United States Department of Agriculture, Forest Service, by the terms of which it purchased from this department of the government certain marked and standing timber on an area of approximately 2,000 acres of land on Logan Creek Chance, Cooper's Creek Drainage, District 10, Union County, Georgia, Chattahoochee National Forest, and on the following November 30 entered into a contract with one Oscar Rice and the defendant Park C. West, to cut, log, saw, transport and deliver such lumber to the place of business of Commonwealth in Murphy, Cherokee County, North Carolina, at an agreed price. Subsequently Rice assigned his interest in the contract to the defendant, Park C. West, who thereafter individually engaged in the carrying out of the terms of the contract with Commonwealth.

Each week during the operation and as provided by the contract, Commonwealth followed the practice of having one of its employees go upon this boundary and look into and observe the manner and way in which the contract was being performed by the defendant, and for the past six months or more prior to the date of the accident, one Carl Palmer, an employee of Commonwealth, had been engaged in making this inspection. Defendant West had his own tools, trucks, appliances, live stock, and hired his own employees, and was solely responsible for each and every step taken in the actual manufacture and delivery of the finished lumber products to Commonwealth in Murphy as aforesaid.

This National Forest is in the State of Georgia and is largely rough, Mountain country. It adjoins the North Carolina boundary.

On May 12, 1954, defendant West was loading logs at a stand where he had been operating for some five to seven days, and at this place had set up and rigged a boom for the purpose of loading the logs on trucks after they were brought in from the woods. The process being that the loggers and cutters of the defendant would go into the area then being cut over and would saw down the trees as marked and sold to Commonwealth—cut the trees into such lengths as Commonwealth had previously designated through its inspector, Carl Palmer. When cut into proper lengths the logs would be dragged or otherwise conveyed to the loading boom which was set up at some convenient portion of the area then being cut over. The common and accepted means of loading the logs in work of this character was through the medium of a hoist which consisted of a drum, powered by a motor, operated through gears, on which a cable was attached and wound. The cable extended to a boom placed in front of the drum and at an angle of approximately 45 degrees. To the top of the boom was attached a pulley on which the cable from the drum ran. The cable extended downward and had grabs attached on its lower end for the purpose of fastening into the logs. Thereupon by the drum's revolution and winding of the cable by gears and through the pulley, the log was hoisted on to the truck. A clutch affected the movement desired.

The boom was held into position by four guy wires attached to its top. One guy wire extended to the rear; one was attached to each side of the boom, and the fourth extended along and was attached to the front. After being loaded the truck would convey the logs about a mile to a saw mill site where each was manufactured into lumber and later, as a finished product, transported to Commonwealth.

The photograph of this apparatus is attached to the original of these findings for information.

The guy wire which extended to the rear of the boom and hoist was attached to a double sourwood tree, with two prongs coming from the same stump; one prong being 15 to 16 inches in diameter and approximately 40 to 50 ft. high. The other being approximately five inches in diameter and 30 to 40 feet high. This double tree bore the brunt of the

pulley when the hoist was raised. A guy wire and cable was attached to this double pronged tree, about twelve inches from the base and around both prongs of said tree. This sourwood tree, was standing some four to five feet from the so called log run along which the logs were dragged to the place of loading.

This tree is the main assigned cause of the negligence alleged, and much time was devoted to acquainting the court with the type and character of such trees. The plaintiffs contended that a sourwood is never used for the purpose to which this one was put. That prudence and good judgment would direct otherwise and that to attach a guy cable on which the main pull was centered to a tree of this character imported a thoughtless disregard for the rights of others and indicated a total indifference to the safety necessary to such work, and that it violated the rule of the prudent man.

The defendant contended that the tree bore every evidence of being sound,— was a live tree and that its size would warrant such use as was placed on it in this instance. That it was carefully checked and being conveniently located, was used.

Varying opinions about the sourwood were expressed—each likely as to the thought of the witness seemed proper. Those opinions are respected. The writer has spent many happy hours in the past in the woods of certain sections of North Carolina,—hunting, fishing the streams, and generally enjoying nature at its best, and believes that he has a broad knowledge of the forest and trees.

The sourwood is a tree generally found in this section of the South. One of God's gifts to Man, and one of Nature's means of providing for Man's sweet tooth. Nothing is finer than sourwood honey, and the busy bee makes that a choice delicacy for food,—a nectar fit for the kings.

This sourwood, growing in the lush soil of Northern Georgia, on a boundary embraced in a National Forest, and saved by being in a public domain, acquired a growth and assumed a size seldom found and actually through being so preserved, became a magnificent figure in this forest land. It was not marked for cutting and was likely being further preserved for future growth.

The North Carolina Department of Conservation and Development in its "Forest Trees", a publication of information about our trees, has this to say about the sourwood:

"The sourwood is found scattered throughout the State on both rich and poor soil, but is least abundant in the low alluvial parts of the State. It is a tree of small dimensions, 8 to 12 inches in diameter and 30 to 40 feet high, rarely larger * * *.

"The wood is heavy, hard, very close grained, compact, brown in color, sometimes tinged with red. It is used to some extent for turnery, handles, and for some other uses."

and I assume this description of it would apply to said tree just over the boundary in Georgia.

The sourwood has no so called tap root, but a close study of the pictures offered as evidence indicates that this one had at least twelve to fifteen roots that could be seen which anchored it to the ground, and through which medium it had stood for many years,—seventy five to one hundred, possibly.

This tree as well as the others to which the guy cables had been previously affixed were inspected prior to being used and each day thereafter one of the three men including the defendant, who were doing the work of loading the trucks, under this loading apparatus, inspected the cables and their connections. The bark had been knocked off of the larger tree at once place near the bottom and left a mark about nine inches long and three to four inches wide. Plaintiffs contend that this was a doty spot, indicating rot. It gave the impression of being a small hollow fairly close to the

ground. At two other places the bark had been knocked off from the effect of the cable sliding on the tree. No one offered direct evidence of any test made thereafter showing any faulty condition and the pictures produced in evidence divulge only the scars.

On the day in question, deceased, who was a timber cruiser for Commonwealth, and Palmer the inspector, went to the site of the logging operation and were seated on a log about 20 feet from the loader while two large white oak logs were being loaded on the truck. The defendant was aware of their presence but being busy had not talked with them. While the defendant was in the act of loading a third log and was manipulating the clutch and while the log being loaded was about to be lifted on to the truck, the sourwood tree uprooted and fell and one of its limbs hit the deceased as he ran, knocking him to the ground and against a large log, striking his head thereon, and from which circumstance he was mortally wounded and died enroute to the hospital at Murphy. The log being loaded at the time of the accident contained approximately 100 feet of lumber and weighed in the neighborhood of six to seven hundred pounds. It was considerably smaller than the two logs just previously loaded on the trucks.

Following his death Commonwealth, his employer, paid to plaintiff Mattie West Radford, his widow, full compensation under the North Carolina Workman's Compensation law.

From the foregoing findings of fact I make legal conclusions as follows:

█ Since plaintiff's injury and death occurred in Georgia, the law of that state is of course applicable.

Counsel for plaintiff readily admit that the laws of Georgia and the decisions of the courts of that state are essentially the same as those of North Carolina, Indian Springs Swimming Pool Corp. v. Maddox, 1944, 70 Ga.App. 842, 29 S.E.2d 724; Freeman v. Levy, 60 Ga.App. 861, 5 S.E.2d 61; Lane Drug Stores v. Story, 1945, 72 Ga.App. 886, 35 S.E.2d 472.

"An invitee is one who goes upon the property of another by the express or implied invitation of the owner or the person in control. A license implies permission and is more than mere sufference; an invitation implies solicitation, desire, or request." Jones v. Southern Railroad Co., 199 N.C. 153 S.E. 637, 638. "Moreover, invitation also implies mutual interest, benefit, or advantage. Practically all of the authorities agree that, if a person enters upon the premises of another solely and exclusively in pursuit of his own pleasure, or to gratify his own curiosity he is a licensee." Adams v. American Enka Corp., 202 N.C. 767, 164 S.E. 367, 369; Money v. Travelers' Hotel Co., 174 N.C. 508, 93 S.E. 964, L.R.A.1918B, 493, and many other cases of like import.

This is likewise the rule of the Georgia courts.

In Pafford v. J. A. Jones Construction Co., 217 N.C. 730, 9 S.E.2d 408, 412, the court handed down a very comprehensive opinion with respect to a licensee. I quote a portion thereof:

"The owner or person in possession of property is ordinarily under no duty to make or keep property in a safe condition for the use of a licensee or to protect mere licensees from injury due to the condition of the property, or from damages incident to the ordinary uses to which the premises are subject. There is no duty to provide safeguards for licensees even though there are dangerous holes, pitfalls, obstructions or other conditions near to the part of the premises to which the permissive use extends. Neither is the owner or person in charge ordinarily under any duty to give licensees warning of concealed perils, although he might, by the exercise of reasonable care, have discovered the defect or danger which caused the injury. It follows that,

as a general rule, the owner or person in charge of property, is not liable for injuries to licensees due to the condition of the property, or as it has been expressed, due to passive negligence or acts of omission. 45 C.J., 799, et seq., § 203; Brigman v. Fiske-Carter Construction Co., 192 N.C. 791, 136 S.E. 125, 49 A. L.R. 773; Money v. Travelers' Hotel Co., 174 N.C. 508, 93 S.E. 964, L. R.A.1918B, 493; Briscoe v. Henderson Lighting & Power Co., 148 N.C. 396, 62 S.E. 600, 19 L.R.A.,N.S., 1116. The duty imposed is to refrain from doing the licensee willful injury and from wantonly and recklessly exposing him to danger. Jones v. Southern R. Co., 199 N.C. 1, 153 S.E. 637; Brigman v. Fiske-Carter Construction Co., supra; Adams v. American Enka Corp., 202 N.C. 767, 164 S.E. 367; Dunnevant v. Southern R. Co., 167 N.C. 232, 83 S.E. 347; Briscoe v. Henderson Lighting & Power Co., supra; Blackstone v. Chelmsford Foundry Co., 170 Mass. 321, 49 N.E. 635; Hillman v. Boston Elev. Ry., 207 Mass. 478, 93 N.E. 653, 32 L.R.A., N.S., 198. The licensee who enters on premises by permission only goes there at his own risk and enjoys the license subject to its concomitant perils. 45 C.J. 798, § 203; Cleveland C. C. & St. L. Ry. Co. v. Means, 59 Ind.App. 383, 104 N.E. 785, 108 N.E. 375, and cases therein cited."

█ Under the facts of this case I conclude that the deceased, Fred Radford, was a licensee on the premises where he met his death; he had never been there prior to this time in so far as the evidence disclosed; the inspections of Commonwealth being wholly made by Palmer for the past six months or more and previously by another of its employees. The evidence is silent as to why the deceased had accompanied Palmer on this occasion with one exception appearing as this leading question was asked on direct examination of the witness, Palmer: "I believe you and Mr. Fred Radford were sent by Mr. Horowitz on May 12th to inspect the completion of a sector of the defendant West's contract with the Commonwealth Lumber Company?" Objection was interposed by defendant. The objection was later sustained. The defendant testified that he had not seen the deceased in the last six months or more and was entirely unaware that he would be with Palmer.

█ But without regard to the status of the deceased, I am of the opinion that plaintiffs have failed to carry the burden placed on them of showing negligence as charged against the defendant. "Negligence is a failure to exercise that care which a reasonably prudent person would exercise under the same or similar circumstances." And before the plaintiffs could recover they must establish by the greater weight of the testimony that Fred Radford was killed and that the defendant was negligent and that his negligence was the proximate cause of the death of the deceased,— that is, the nearest or the most direct cause, or the cause without which his death would not have come about. Plaintiffs' whole case is bottomed on the uprooting of the sourwood tree,—an alleged defective place thereon near its base, and the fact that it lacked a tap root,—its size and ultimately its uprooting. The defendant and his two employees worked under this boom and its various parts in loading and stood to suffer injury if any accident came about from its operation. Each testified that he examined it carefully and it looked like a sound tree and nothing in its appearance gave any indication that it was otherwise. Would its use under this evidence, for the purposes indicated therefore violate the rule of the prudent man, or indicate such negligence on the part of the defendant? I fail so to find and thereupon conclude that plaintiffs are not entitled to recover.

Counsel will submit decree.